Dr. Jimmie E. LYTLE *v.* THE CITIZENS BANK OF BATESVILLE

CA 81-177                                   630 S.W. 2d 546

Court of Appeals of Arkansas
Opinion delivered March 24, 1982
[Rehearing denied April 21, 1982.]

*Bennett & Purtle,* for appellant.

*L. Gray Dellinger,* for appellee.

TOM GLAZE, Judge. In August of 1979, the appellant sold a tractor and trailer to Bobby Reeves and his wife for $20,000. The Citizens Bank of Batesville, hereinafter referred to as Bank, loaned the Reeveses $20,000 to finance the purchase, with the proceeds from the loan going to appellant to satisfy other indebtedness to the Bank. The Reeveses granted a lien to the Bank on the tractor, trailer and on certain lots in Calico Rock, Arkansas. Appellant individually guaranteed the loan.

The Reeveses defaulted after making two payments, and the Bank foreclosed on the security, naming appellant, the Reeveses and an individual who claimed a repairman's lien on the truck. The repairman is no longer a party to the suit. The Reeveses were totally in default and, after a hearing, the court entered a decree on October 21, 1980, granting judgment in favor of the Bank against the Reeveses and appellant jointly and severally for the balance due on the $20,000 loan.[1]

The personal property was sold to appellant on November 7, 1980, and the real estate was set for sale on December 16, 1980. The Bank entered a bid for $13,000 on the property, which was approximately the amount needed to satisfy appellant's debt. On December 18, 1980, the Bank filed a motion to withdraw its bid and deny confirmation of the sale. A hearing was held on January 23, 1981, and the chancellor entered an order on February 12, 1981, denying confirmation of the December 16 sale and reforming the mortgages between the Reeveses and the Bank so as to delete the two lots. A second sale of the remaining five lots was ordered. That sale was held on March 18, 1981, at which time

---

[1]After the $20,000 loan was made, the Reeveses obtained an additional $10,000, which was secured by his second lien on the same collateral, plus a lien on another vehicle. That transaction is not a part of this lawsuit since the chancellor ruled that appellant had not given a continuing guarantee and, therefore, had not guaranteed the subsequent $10,000 advance.

appellant bid $100 for the lots. The lots were sold and deeded to him and this sale was confirmed. A deficiency judgment was entered, which appellant satisfied on May 7, 1981.

Appellant argues that the trial court erred in not confirming the first sale, and it also erred in reforming the mortgage to delete two lots. He contends the first sale should have been confirmed because the attorney for the Bank testified at the trial. He argues further that even though the Bank's attorney withdrew during the trial, he still later participated in the case by preparing and approving the proposed decree. On the other side, the Bank urges that this appeal should be dismissed as moot since appellant paid the judgment, and it has been satisfied.

## MOOTNESS OF THE APPEAL

No motion for dismissal of the appeal on the grounds of mootness was filed by the Bank, but the point was raised in the Bank's brief. We chose to treat this issue as though it was raised by a motion to dismiss, and time was granted both parties to submit affidavits in support of and in contravention of such a motion. Ark. Stat. Ann. § 27-2139 (Repl. 1979).

Appellant has filed an affidavit which states that a supersedeas bond was not available to be posted because of appellant's financial condition. The affidavit further states that since the judgment had not been stayed by a supersedeas bond, the Bank's attorney indicated that he intended to execute on appellant's office equipment and bank account. Appellant then claims he borrowed the money to pay the judgment as a result of the threat of execution. That sworn allegation has not been contradicted.

Some jurisdictions hold that the payment of a judgment under any circumstances bars the payer's right to appeal. However, in the majority of jurisdictions, the effect of the payment of a judgment upon the right of appeal by the payer is determined by whether the payment was voluntary or involuntary. In other words, if the payment was voluntary, then the case is moot, but if the payment was involuntary, the appeal is not precluded. The question which often arises

under this rule is what constitutes an involuntary payment of a judgment. For instance, in some jurisdictions the courts have held that a payment is involuntary if it is made under threat of execution or garnishment. There are other jurisdictions, however, which adhere to the rule that a payment is involuntary only if it is made after the issuance of an execution or garnishment. Another variation of this majority rule is a requirement that if, as a matter of right, the payer could have posted a supersedeas bond, he must show that he was unable to post such a bond, or his payment of the judgment is deemed voluntary. For a discussion of the various rules, along with citations to the various jurisdictions, see: Defeated Party's Payment or Satisfaction of, or Other Compliance With, Civil Judgment as Barring His Right to Appeal, Annot. 39 A.L.R. 2d 153 (1955); 4 Am. Jur. 2d *Appeal and Error,* § 260 at 755 (1962); *Metropolitan Development and Housing Agency* v. *Hill,* 518 S.W. 2d 754 (Tenn. App. 1974).

We adopt the majority rule as the better reasoned rule. Thus, if appellant's payment was voluntary, then the case is moot, but if the payment was involuntary, this appeal is not precluded. In applying this rule to the facts at bar, we must determine whether the payment made by appellant was voluntary or involuntary. In doing so, we believe that one of the most important factors to be considered is whether appellant was able to post a supersedeas bond at the time he satisfied the judgment.[2] The record supports the conclusion that he could have done so.

There is nothing in the record which shows appellant even requested the court to set the amount of a supersedeas bond, much less to show his financial inability to pay such cost. Obviously, appellant had the financial ability and resources to borrow $13,364 so he could satisfy the judgment in full. There is no evidence to indicate the posting of a supersedeas bond would have been a greater or lesser

[2]Arkansas Rules of Appellate Procedure, Rule 8, Ark. Stat. Ann. Vol. 3A (Repl. 1979), provides that a supersedeas bond is necessary to stay appellee's proceeding on the judgment. Rule 8 provides that whenever the appellant "desires a stay on appeal" he must post a supersedeas bond, but it does not require the posting of a bond in order to appeal.

financial burden on appellant than his full payment of the obligation imposed under the judgment. For whatever reasons, appellant simply chose to forego his right to request a bond in an effort to stay the trial court's judgment and any subsequent proceedings to enforce it.

In view of the state of the record before us, we find appellant's payment was voluntary. Therefore, we hold this appeal should be dismissed because appellant's satisfaction of the trial court's judgment rendered the issues on appeal moot.

Dismissed.

MAYFIELD, C.J., concurs.

COOPER, J., dissents.

JAMES R. COOPER, Judge, dissenting. I agree with the majority's opinion which adopts the majority rule. That rule states that if the appellant's payment was voluntary, then the case is moot, but if the payment was involuntary, the appeal is not precluded. However, I do not believe that the appellant should be required to show that he could not, because of financial inability, obtain a supersedeas bond.

The Arkansas Rules of Appellate Procedure, Ark. Stat. Ann. Vol. 3A (Repl. 1979) do not require the posting of a supersedeas bond in order to appeal. Rule 8 only states that whenever an appellant "desires a stay on appeal" he must post a supersedeas bond.

The only real issue here is whether the appellant's payment was voluntary or involuntary. The appellant was threatened with execution on the judgment and only paid the judgment under that threat. The appellant did not acquiesce in the judgment, and he did not pay the judgment with the intent to forego his appeal. His payment was obviously involuntary. Having so found, I believe the merits of the case should be considered, particularly since several of the points raised are important ones. Because I believe the merits of the case should be considered, I have done so.

## THE ATTORNEY AS WITNESS

Appellant and Mr. John C. Gregg, then attorney for the Bank, attended the foreclosure sale on December 16, 1980. At the hearing held on the motion of the Bank to withdraw its bid, it became necessary for Mr. Gregg to testify as to the reasons he entered the bid for the Bank. In its motion to withdraw the bid, the Bank alleged that Mr. Gregg did not have the authority to enter any bid whatsoever on the property on behalf of the Bank. Mr. Gregg's testimony indicated that he thought appellant was confused and did not know what to do at the sale and that he was attempting to protect appellant's interests as well as those of the Bank.

The chancellor correctly pointed out, when Mr. Gregg indicated he wished to testify, that he should have known that he would have to testify, based on allegations made in his opening statement. Mr. Gregg withdrew from the case and Mr. L. Gray Dellinger assumed representation of the Bank. There was no objection made to this substitution of counsel. Mr. Gregg then took the stand and testified regarding his actions at the sale.

The *Arkansas Code of Professional Responsibility*,[1] 33 Ark. L. Rev. 605 (1980), provides in Disciplinary Rule 5-102 as follows:

> (A)   If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101 (B) (1) through (4).

Disciplinary Rule 5-101 provides in part as follows:

---

[1]Adopted by the Arkansas Supreme Court. *Per Curiam,* 260 Ark. 910 (June 21, 1976).

(B)   A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

(1)   If the testimony will relate solely to an uncontested matter.

(2)   If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3)   If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4)   As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

The Arkansas Supreme Court has dealt with the problem of testimony by attorneys engaged as trial counsel in several cases. In *Boling* v. *Gibson,* 266 Ark. 310, 584 S.W. 2d 14 (1979), the Court stated:

In some of these cases [previously cited] we have recognized that there are cases in which the necessity for the lawyer testifying cannot be anticipated until a stage of the trial at which his withdrawal, or that of his firm, would be impossible without serious injustice to his client, and that withdrawal should not be expected in such cases. '[B]ut it should be clear that the necessity for the lawyer's testimony could not have been anticipated.' [citing cases] If the lawyer's testimony was necessary in this instance, it should have been known two months prior to trial. It is not sufficient to leave further trial to a member of the testifying attorney's firm. [citing cases] . . . .

In *Dingledine* v. *Dingledine,* supra, we pointed out observations in the Code of Professional Responsibility that an advocate who becomes a witness is put in the position of arguing his own credibility and that

there is inconsistency in the function of an advocate to advance or argue the cause of another and that of a witness to state facts objectively. Credibility was the issue here.

In *Boling, supra,* the Supreme Court reversed and remanded for a new trial because of the testimony of the attorney. I do not believe it necessary to do so here. First, Mr. Gregg did not testify at the trial of this case, but testified only with regard to the motion of the Bank to withdraw its bid. Also, he testified only after he had withdrawn from the case and substitute counsel was employed. The substitution of counsel was done without objection. The substitute counsel was not a member of Mr. Gregg's law firm. Even if this Court did reverse, the only new hearing that would be required would be a new nearing on whether the Bank should be allowed to withdraw its bid and whether the mortgages should be reformed. This new hearing would then be conducted by a different trial counsel.

Only a small portion of the entire testimony in this case could possibly be tainted by Mr. Gregg's testimony. I do not believe that the appellant was so prejudiced as to require reversal. In fact, even if the testimony of the attorney was stricken, there was sufficient evidence on which the chancellor could have allowed the withdrawal of the bid. In *Montgomery* v. *First National Bank of Newport*, 246 Ark. 502, 439 S.W. 2d 299 (1969), our Supreme Court pointed out that it had not yet held that testimony by an attorney in violation of the canons of ethics was, standing alone, a basis for holding the testimony inadmissible, nor had the Court held that an attorney was incompetent as a witness.

## CONFIRMATION OF JUDICIAL SALE

Following the hearing on the Bank's motion to withdraw its bid, the trial court issued a letter opinion in which he found that Mr. Gregg entered the bid for the Bank without authorization. The court further found that the bid entered by the Bank was far in excess of the actual value of the property, and the practical effect of a confirmation of the

sale would be to unfairly reward appellant by virtue of a mistake made by the Bank and its attorney.

It is well established that in judicial sales, the court is the vendor and is vested with great discretion in deciding whether to confirm or refuse to confirm a sale. It is clear that the function of the appellate court is not to substitute its decision for that of the trial court where confirmation is refused, but we are to review the case to determine whether the trial court abused his discretion in refusing to confirm a sale. In this case, it is obvious that an error was made by the entry of the original bid, and it is uncontradicted that the Bank's attorney acted without authority to enter such a bid. I agree with the chancellor that confirmation of the first sale would unfairly inure to the benefit of appellant and I find no abuse of the chancellor's discretion in refusing to confirm the first sale and in ordering a resale. See *Keirs* v. *Mt. Comfort Enterprises, Inc.*, 266 Ark. 523, 587 S.W. 2d 8 (1979): *Fleming* v. *Southland Life Insurance Co.*, 263 Ark. 272, 564 S.W. 2d 216 (1978).

## REFORMATION OF THE MORTGAGE

The trial court reformed the mortgage from Reeves to the Bank to exclude the two lots on which Reeves' home was located. Those lots had a mortgage to Jim Walter Homes. The trial court specifically found that all interested parties did not intend that those lots be covered by the mortgage.

Reeves' testimony was that he believed the mortgage to the Bank only covered the vacant lots. An officer of the Bank indicated that he did not believe the Bank's mortgage covered the land on which the house sat and that the Bank had relied on the description furnished by Reeves. Appellant's testimony indicated that he did not believe that any lots except the vacant ones were covered by the mortgage. Thus, it appears that the chancellor was correct in finding that there was a mutual mistake as to the lands which were intended to be covered by the mortgage. All parties to this litigation were laboring under the misconception that the land mortgaged were the vacant lots. The mistake was shared by all parties, and there is ample evidence from which

the chancellor could find that the parties did not intend that the mortgage cover the lots on which the residence was located. I believe that the trial court had sufficient evidence of a mutual mistake and that the court was correct in reforming the mortgage. *Yeargan* v. *Bank of Montgomery County*, 268 Ark. 752, 595 S.W. 2d 704 (Ark. App. 1980); *Winkle* v. *Grand National Bank*, 267 Ark. 123, 601 S.W. 2d 559 (1980).

I would affirm this case on the merits.